[No. 2136.]

## J. S. Irvine *v.* The State.

1. Practice — Continuance.— It is no objection to an application for a first continuance that the absent testimony is cumulative.
2. Same — Judicial Discretion.— While even a first continuance, though the application therefor complies with the statute, is not a matter of right, yet the discretion to grant or refuse, which is conferred upon the trial judge, is not an arbitrary but a *sound* discretion, and especially should the exercise of a *sound* discretion in connection with the refusal of the continuance in the first instance appear, when the court is called to pass upon it the second time in connection with the motion for a new trial.   See the opinion *in extenso* for a state of case wherein the trial court erred, first, in refusing the continuance, and again in refusing a new trial therefor.
3. Same — Charge of the Court.— Trial courts should not, by frequent repetitions, place too prominently before a jury any principle of law involved in the case on trial.   Especially is it important that this rule be observed in criminal cases, in order to guard against creating an impression upon the

minds of the jury as to what may be the opinion of the court with regard to the facts to which the principle is applicable.

4. SAME.— A defendant is entitled to a distinct and affirmative presentation of the issues which arise upon his evidence. A charge is, therefore, objectionable, which presents the phases of the defense in a negative form only.

APPEAL from the District Court of Montague.    Tried below before the Hon. F. E. Piner.

The indictment in this case charged the appellant with the murder of J. W. Kerr, in Montague county, Texas, on the 2d day of July, 1885.   His trial resulted in his conviction of murder in the second degree, and his punishment was assessed at confinement in the penitentiary for the term of five years.

J. T. S. Stallings was the first witness for the State.  He testified that he knew the defendant and his brother Tom Irvine, and was acquainted with J. W. Kerr at the time of his death, which occurred from the effects of pistol-shot wounds, in the town of Bowie, Montague county, Texas, on the 2d day of July, 1885.  A few days prior to the said 2d day of July, Tom Irvine and Kerr had a difficulty in and about Riley's drug store in the said town.   Defendant was not then present.  The two Irvines were in the furniture business together. On the occasion last mentioned, Tom Irvine and Kerr met on the sidewalk in front of the drug store, and some words passed between them about a claim that Kerr held against the Irvines.   Witness could not remember the tenor of those remarks.    Presently Kerr went into the drug store.   Tom Irvine followed, and said to Kerr: "Captain, you have 'monkeyed' with my business."   Kerr denied the charge, and called upon banker Easley to support him in his denial.   Witness did not hear what, if anything, was said by Easley when appealed to.  Other words passed between Tom Irvine and Kerr, and finally Tom asked Kerr: "Do you think I am afraid of you?" Kerr replied: "If you jump on me you will jump off very quick." Thereupon Tom Irvine, who had been drinking, struck at Kerr with his fist, and fell, and Kerr drew his knife and advanced upon Tom, attempting to open his knife with his teeth.   Doctor Riley and W. E. H. Jones then caught Kerr, and Tom Irvine got up and threw a vase at Kerr, striking him about the head.   From Kerr's head the vase glanced and broke against a show-case.  About four hours before this rencontre, the witness saw the vase, and it then had a paper attached to it by a string.   Witness did not know what was written on the paper.   Tom Irvine was twenty-eight years old, and was larger and heavier than his brother, the defendant.   He had

been accidentally shot through the left shoulder, and had but little use of his left arm.    Kerr was about forty-seven years old, weighed one hundred and seventy or one hundred and eighty pounds, and was a stout, robust, heavily built man.    His left elbow had been shattered by a shot, and he had but little use of his left arm.

The witness saw the last part of the struggle in which Kerr was killed, and which occurred, as stated, on the 2d day of July, 1885. Witness was about two blocks, or five hundred feet, distant from the scene where the shooting occurred.    He heard the reports of pistols, and, looking around, he saw Tom Irvine and Kerr shooting at each other, and defendant rushing on Kerr as if to catch or seize him.    Defendant had no pistol in his hand that the witness saw, nor did he fire a shot.    He ran up to Kerr and struck at him with something, and he and Kerr clinched, and struggled, the witness thought, for the possession of Kerr's pistol.    Tom then stepped up and shot Kerr.    Two shots were fired, but the smoke obscured the vision of the witness, and he did not see who fired the second shot. Kerr commenced sinking when shot, and defendant laid him down.

Cross-examined, the witness said that Tom Irvine was drunk when he and Kerr had the difficulty in Riley's drug store a few days before the fatal rencontre.    Kerr, when he remarked to Tom that if he jumped on him he would jump off very quick, advanced upon Tom.    Tom Irvine said that Kerr had written abroad for claims not due upon which to attach his property, and that he would not pay claims against him until they were due.    Witness had known the defendant for the two and a half years he had lived in Bowie. His reputation was that of a peaceable citizen.

J. R. Frost, for the State, produced a plat of the town of Bowie, and testified that he drafted the same, and that it was correct. According to that plat Mason street, ninety feet wide, running north and south, is intersected near its north extremity by Tarrant street, running east and west, and, near its southern extremity, at a point a short distance north of the Fort Worth & Denver City railway track, by Wise street, running east and west.    The bank building stood on the west corner of Tarrant and northwest corner of Mason street.    Kerr's office stood on Tarrant street west of the bank, and on the north side of the street.    Riley's drug store, the back part of which was Jarrett's office, was on the corner of Tarrant and Mason streets, opposite the bank.    The buildings then running south on the west side of Mason street were occupied by the following persons or used for business houses in the order named:  Crawford, saloon, Check, Arnold, vacant, Andrews, Irvine & Co.'s furni-

ture store, Kapp, and a drug store which stood at the corner of Wise street. Opposite the drug store, on Wise street, was a saloon. Ward's saloon stood on the east side of Tarrant street, at the corner of Mason street, and just opposite and east from the bank. The public well was in the exact center of the intersection of Mason and Tarrant streets. The Lockard House was east and opposite Riley's drug store on Mason street, and south and opposite Ward's saloon on Tarrant street, forming the other corner of Mason and Tarrant streets. The buildings on Mason street, on the east side running south, came then in the following order: Wheeler, Matlock, Central Hotel, vacant, livery-stable, Raines, Cleaver, postoffice and Hulme. Mason & Sons' business house stood on the corner south of Hulme, and across Wise street.

Continuing, the witness testified that between 5 and 6 o'clock on the evening of July 2, 1885, while he was sitting on a chair in front of Crawford's store on Mason street, Tom Irvine and the deceased, quarreling, came around the corner of Doctor Riley's drug store. Witness heard deceased say: "Go away, Tom, I want no row with you." They went on down Mason street, quartering across towards the postoffice, and when they got opposite the Central Hotel the deceased stopped and Tom Irvine stepped a short distance ahead and called the defendant, who came towards him from the direction of Irvine's furniture store. Defendant stepped up to the deceased, handed him a piece of paper and asked: "Did you write that?" Deceased made a reply which witness did not hear, when defendant struck or struck at the deceased, and deceased staggered or stepped back and drew a pistol with which he struck the defendant. Tom Irvine then drew a pistol and he and deceased fired at each other, shooting about the same time. Tom was to the right and defendant to the left of deceased. Deceased backed up the street, firing at Tom first and then at defendant. Tom and the defendant followed the deceased, Tom firing four or five shots and the defendant two or three, until the parties got to a point in Mason street near the public well, when defendant caught up a board, rushed upon deceased and struck him with it, and then clinched him from behind, when Tom Irvine ran up, placed his pistol near deceased's body and fired, and defendant eased deceased to the ground.

Cross-examined, witness testified that he sat about thirty or forty steps from where the deceased fell. He saw nothing of a pistol lying on the ground, nor did he see a pistol thrown into the air. Tom Irvine called the defendant two or three times just before the firing began. Witness did not know where the defendant got the

paper he handed the deceased. Witness did not hear what deceased said in reply to defendant's question whether or not he wrote it, but he said something. Defendant struck or struck at the deceased, and the deceased struck the defendant. The deceased drew his pistol before Tom Irvine drew his, and, the witness thought, fired a moment first. Defendant had a bleeding cut over the left eye which was inflicted with a hard instrument. Witness did not know when nor where the defendant got his pistol. He put his pistol up and caught up the board or stave just before deceased was shot down. His pistol was a bright thirty-eight calibre revolver. Deceased fell at the well. Witness could not swear that the deceased did not knock the defendant down when he struck him.

G. W. McNew was the next witness for the State. He testified that he knew the defendant and his brother Tom, and at the time of his death was acquainted with the deceased, who was a lawyer, and practiced his profession in the town of Bowie. Some two or three hours before the homicide, the witness saw the defendant and his brother Tom, Doctor Riley and Mr. Jarrett standing together in the street some twenty or thirty feet distant from the office of the deceased. Witness heard Tom Irvine swear that he would go into the deceased's office, which Doctor Riley prevented him from doing. Witness heard some one, defendant he thought, tell Tom that he could see deceased on the street, and that he must not go into his office. The parties presently went off together towards Jarrett's office. Witness did not know that deceased saw or heard the parties at the time referred to, but, having passed them, and gone into deceased's office, where he found the deceased and 'Squire Stallings, he, himself, from that office, heard Tom cursing; and, whether or not deceased and Stallings heard him, they were quite as well situated to hear him as witness was. Some time after this the deceased left his office and started off towards Riley's drug store. When about opposite Jarrett's office, he was met by Tom Irvine, and some words passed between them. Witness heard the deceased say: "I don't want to have a difficulty with you, Tom." Tom and deceased then passed into Mason street, and when in front of Riley's drug store, or Crawford's store, they stopped and Tom called the defendant. Defendant came up the street from about his furniture store, and handed deceased a paper, and asked deceased if he signed it. Deceased replied that he did. Defendant thereupon struck deceased with his fist. Deceased stepped back and drew his pistol, and he and Tom fired at each other about the same time. Defendant then ran at the deceased and was knocked down

by the deceased. Defendant managed to catch deceased about the neck, when Tom ran up and shot the deceased. Deceased sank back and defendant eased him to the ground.

Cross-examined, the witness said that he saw the defendant throughout the whole of the difficulty, but did not see him with a pistol, nor did he see him shoot. Deceased's pistol dropped from his hand as the defendant laid him down.

J. M. Crawford was the next witness for the State. He testified that he saw the difficulty which culminated in the death of Mr. Kerr on the 2d day of July, 1885. Deceased passed witness's place on his way home, or at least going in that direction, late that evening, and when about opposite witness's door, and about in the middle of the street, he was met by Tom Irvine. Talk of some kind ensued, judging from their manner and gesticulation. Presently Tom called: "Sid!" and motioned some one to come to him. The defendant arrived in a few moments, and handed a paper to the deceased. Something was evidently said by each of the parties, though witness overheard nothing, and then the defendant struck Kerr with his fist. Kerr drew his pistol and struck at the defendant. By this time Tom Irvine had drawn his pistol, and he and deceased began firing about the same time. Kerr was backing all the time the shooting was going on until the public well was reached. Then the defendant rushed forward and struck deceased over the head with a plank. He then caught deceased and held him until Tom came up and shot him. When he fired the fatal shot Tom held the pistol against Kerr's side. Witness went to the rear of his store after the fatal shot was fired, and saw no more of the difficulty. Kerr's body was brought into witness's store, and taken thence to his home. Kerr retreated some sixty or seventy feet while the firing was kept up, and the defendant and Tom Irvine advanced that distance, but not as rapidly as Kerr retreated.

Cross-examined, the witness said that if the defendant was knocked down during the struggle, he did not see or know it. If the defendant had or used a pistol during the struggle, witness did not see it. If the defendant had a pistol between the time the fight began until he picked up the board, the witness in all probability would not have seen it. He had no pistol that the witness saw when he went up to Kerr with the board. If Kerr knocked defendant down, and shot at him while he was on the ground, witness did not see it. He did not see the defendant when he picked up the board. The shooting, and the whole of the difficulty, occurred on the street, in plain view of the witness, except when the shooting

commenced.    At the first shot witness stepped from his door to his
window, making but one quick step, and saw nothing of the fight
while he was passing between those two points.    He was unable to
say whether or not a shot was fired while he was passing from his
door to his window.    Defendant, the witness thought, was on the
street throughout the difficulty.    He might possibly have had and
fired a pistol without witness seeing it, as he did not look at him
constantly. Witness did not think, however, that the defendant had a
pistol at any time during the difficulty.    Defendant was in his shirt
sleeves, but had his vest on.    Witness had one perfect eye, and
could partially see with the other.

On re-direct examination, the witness said that, according to his
recollection, Kerr was stunned by the blow with the plank, and
dropped his pistol then.    This was before Tom Irvine rushed up and
fired the fatal shot.    Re-crossed, witness said that he did not see
Kerr's pistol fall to the ground, but he saw Kerr's hand, holding the
pistol, go down.    Kerr's pistol was presented towards Tom Irvine
when he was struck with the board in defendant's hands.    Witness
saw no pistol on the ground.

M. Wheeler testified, for the State, that while he was sitting on
the fence around the public well, about or near sundown on the
evening of July 2, 1885, he saw Captain J. W. Kerr leave his office
and start towards Mason street, which led in the direction of the
postoffice and of Kerr's house.    When Kerr got about opposite Jar-
rett's office, Tom Irvine stepped from Jarrett's office and joined Kerr.
They had some talk which witness did not hear, and finally passed
on to Mason street, seemingly looking for some one.    About this
time witness left the fence and went into his house and took his
position near his front window, where he could see it out.    Kerr
and Tom Irvine walked down Mason street, quartering across it to-
wards the postoffice and towards Kerr's house.    They stopped about
the middle of the street and a little south of witness's house, and
Tom called to the defendant by name, motioning him to come to
where he and Kerr were.    Defendant soon joined them and handed
Kerr a paper which Kerr examined, and presently defendant struck
Kerr with his fist.    Kerr staggered or stepped back and commenced
drawing his pistol.    Tom Irvine began to draw his pistol.    The two
pistols were drawn about the same time, but witness saw Kerr's
first.    Witness then stepped back from his window and saw none
of the firing which immediately ensued, nor did he see anything
that happened subsequently.    When he went to the door after the
shooting was over, he saw Kerr lying on the ground and defendant

stooping over him. Defendant then had a pistol in his hand, which he seemed to look at for a moment, when he laid it on the ground. The difficulty began at a point about forty yards distant from the point where Tom Irvine joined Kerr. Kerr and Tom walked side by side from the point where they met to the point where the fight began. Kerr's left arm was disabled. There was no bone from the elbow to the hand, and that part of his arm could be bent around in any manner. Tom Irvine and defendant were both stout, healthy looking young men, either of them Kerr's physical superior.

Cross-examined, the witness testified that defendant struck Kerr immediately after Kerr commenced to examine the paper. Kerr made no effort to strike the defendant in return, but commenced to draw his pistol. Witness stepped back from his position at the window at this time, because he was in pretty fair range of Tom Irvine's pistol. From the window witness stepped to the space next to the door, and remained there until the shooting was over, which was within about three minutes. When the pistols were drawn the witness could see about six feet on each side of the parties. No one save the Irvines were then within six feet of Kerr. There was a crowd of people on the sidewalk, some five or six steps distant from the Irvines and Kerr. Witness could not say whether Kerr stepped back after the defendant struck him, or whether he staggered back from the effect of the blow. Kerr, when struck by defendant, held the paper in his right hand. He, immediately upon being struck, thrust his right hand into the corresponding pocket of his pants, and commenced to draw his pistol. Witness stood to Kerr's left at that time. Kerr had on a long-tailed "duster" coat, but did not draw his pistol from the pocket of that coat. The shooting did not begin for several seconds after witness stepped back from the window. The only time during the difficulty when witness saw a pistol in the defendant's hand was when, after the shooting was over, he was stooping over Kerr's body. He was then looking at a pistol which he presently placed on the ground near the body. Kerr was a man of about forty-five years of age, would weigh perhaps one hundred and ninety pounds, and was strong and robust, except that his left arm was boneless from the elbow down. He could carry a book and things of such weight on that arm. Kerr, when witness saw him first, just before the fight, was going from his office towards Riley's drug store. Kerr's office, as shown by the plat, was on the north side of Tarrant street. Jarrett's office, opposite which he and Tom Irvine met, was on the south side of Tarrant street, and at the rear end of Doctor Riley's drug store.

Tom Irvine went from Jarrett's office where he joined Kerr on Tarrant street.  After a few moments' talk they passed from. Tarrant street to Mason street and walked a short distance down the sidewalk, looking into houses as though looking for some one.  Then they started quartering across the street, and walked in that direction until they got to and stopped in the middle of the street.  The place where they stopped was about thirty steps north of the post-office, and about one hundred and fifteen yards from Kerr's house.

T. H. Mathews was the next witness for the State.  He testified that he saw the defendant on the gallery of Riley's drug store about one hour before the fatal difficulty.  He then called the witness's attention to a vase which was hanging on Riley's gallery by a string, to which was attached a note which read as follows: "This vase was presented to J. W. Kerr by T. E. Irvine.  *Please let it hang.*"  This note was written in the defendant's handwriting, and defendant called witness's attention to it in a jocular manner.  Tom Irvine and the defendant were brothers.  The latter was employed about T. E. Irvine & Co.'s furniture store, but witness was unable to say whether he was a partner or a clerk.  Witness, just before the difficulty began, had a business interview with Kerr in front of his office.  Kerr had a letter in his hand which he said he was going to mail, and he and witness started from Kerr's office to the postoffice.  When opposite Jarrett's office, Tom Irvine, who came from Jarrett's office, stepped up and told Kerr that he wanted to see him a minute.  Tom then asked Kerr if he wrote that note and put it on the vase.  Kerr said that he did.  Tom then told Kerr that he would make the defendant whip him or do it himself.  Kerr. replied: "Now, Tom, I want you to go away and let me alone.  I want no difficulty with you."  Witness started on down the street, followed by Kerr, who in turn was followed by Tom Irvine.  When witness got to the platform in front of Riley's drug store, he heard Tom Irvine call the defendant.  When Kerr stepped up on the platform, Tom put his hand on Kerr and told him to stop, and asked witness if he knew where the defendant then was.  Witness replied that he did not, and walked on down to Crawford's store and stopped.  Kerr and Tom followed, until they reached the front of Crawford's store, when Kerr left the sidewalk and started across the street, quartering towards the postoffice.  Tom followed, and Kerr stopped about the middle of the street, turned around and said: "Now, Tom, I warn you to let me alone.  I don't want to have a difficulty with you."  Tom then called the defendant several times, and the witness soon saw defendant going towards Kerr and Tom in a fast

walk, with a piece of paper in his hands. He handed the paper to Kerr, and struck him a blow with his fist about the same time. The blow staggered Kerr backwards, when he drew his pistol and presented it at the defendant. About the time that Kerr drew his pistol and presented it at the defendant, Tom Irvine drew his pistol and covered Kerr. Kerr turned and threw his pistol towards Tom, and they fired about the same time. The shots were fired so nearly at the same instant that it was impossible to decide which was fired first. Defendant then ran at Kerr with something in his hand. Kerr struck at him with his pistol, and either knocked or shoved him down. Kerr then began to retreat, firing at Tom Irvine, who advanced firing upon him. After Kerr had retreated a short distance, defendant picked up a stick, or some other such instrument, with which he rushed upon and struck Kerr. Kerr turned from defendant, about half around, when defendant rushed up, caught Kerr and held him until Tom Irvine ran around in front of and shot Kerr, and the defendant eased the body to the ground. The pistol was so near the body, when fired, that the flash powder-burned Kerr's clothing and flesh. Kerr died about 10 o'clock on that same night. Tom Irvine ran off up the street after the fatal shot was fired, and witness had not seen him since.

Cross-examined, the witness stated that he saw the beginning and the close of the fight. Witness stood within thirty feet of the parties with nothing intervening to obstruct his view. He did not think that Kerr fired at the defendant while the latter was on the ground. Witness saw nothing in the defendant's hand as he arose from the ground. He had something in his hand before that time, or at least when Kerr turned from him and presented his pistol at Tom Irvine, which, the witness thought, was a pistol, and he thought the defendant used it as a pistol. If the defendant fired at all, he fired before he was knocked down. Witness did not know what became of defendant's pistol, if he had one, or of the instrument which he had in his hand, and which witness took to be a pistol. Witness could not swear positively that the defendant had or used a pistol during the fight, but it was his firm belief, based upon what he saw, that defendant had, and fired a pistol before he was knocked down. Witness saw defendant pick up the stick or board after he got up, and saw him strike Kerr with it, using, the witness thought, both hands. Witness was watching the defendant when he eased Kerr to the ground, and did not see him pick up a pistol or lay one down. Witness did not think that, just at the time defendant caught Kerr, either Kerr or defendant fired. Kerr fell about thirty feet from

where the firing began.   Defendant said nothing that witness heard when he rushed up and caught Kerr.

L. H. Rosser testified, for the State, that he went from the lumber yard to Jarrett's office, a short time before the fatal rencontre. Kerr walked with him a part of the way, and kept on to his office. While witness was in Jarrett's office, Tom Irvine stepped to the door, and, in an angry manner, said that he was going to whip Kerr that evening, and could whip any one who thought well of Kerr. While witness and Tom were in Jarrett's office, Kerr and Mr. Mathews passed down the street from Kerr's office.   When Kerr came in sight, Mr. Jarrett put his arm on Tom's shoulder and told him that he must not go out to Kerr,—to keep away from him. Tom then told Jarrett to turn him loose or he would knock the water out of him, and placed his hand on his pistol, which was secured to his person by the waist-band of his pants.   Tom then approached Kerr and Mathews, who were in the street, going towards Kerr's home.   Tom told Kerr that he wanted to see him a minute.   Kerr told Tom to go away, as he wanted no trouble.   He cautioned Tom several times not to bother him.   The two, Kerr and Tom, walked off down the street together, the first insisting that the latter should go away, and the latter insisting that the former should explain something, the witness did not know what.   Witness passed out of Jarrett's office, as they left the street on which they were, and kept in sight of them until they got opposite the Central Hotel on Mason street, when Tom called the defendant, who approached from the direction of the Irvine Brothers' furniture store. Defendant had something in his hand, which he gave to Kerr, who took it, and almost immediately the defendant struck at him with his fist.   Defendant and Kerr both stepped back, Kerr nearly falling.   About this time witness saw Tom with his pistol in his hand, holding it down by his right side.   Kerr presented his pistol at defendant, and Tom his at Kerr.   Kerr then shifted the position of his pistol and fired at Tom, and then Tom fired at him.   Witness thought he saw the defendant draw a pistol, and dodged because he was in range of defendant.   Witness next saw Kerr retreating backwards and a little sideways, firing his pistol.   Tom Irvine and defendant both followed Kerr.   Defendant caught Kerr with one hand and Tom fired at him.   Kerr broke loose from defendant and ran backwards and sideways a short distance.   About this time a steam thresher passed in front of the contending parties, and witness indistinctly saw defendant and Kerr rush together and go to striking each other, witness thought with pistols.   He saw a pistol fly

from the hands of one of them, over their heads, into a well-yard, some ten or fifteen feet distant. Just after this occurred, Tom ran up, put his pistol hand around defendant's body, and fired at Kerr. Defendant then loosened his grasp on Kerr and eased him to the ground. Witness heard Kerr cry "Oh!" and saw defendant's face bleeding a little. He then started to Kerr and the Irvines, but as he got near he saw Tom Irvine working his pistol as though he was going to shoot again, and in consequence dropped back. Just as the witness started to the body he saw a pistol in the hands of the defendant, another in the hands of Tom Irvine, and a third lying in the yard around the well, which had been thrown there as before stated.

Cross-examined, the witness stated that he was unable to say whether defendant had a board, a stick or a pistol in his hand when he and Kerr were striking at each other, at the time the steam thresher passed, but he thought then and now that both men had pistols. The pistol which was thrown into the well-yard was afterwards seen by the witness. It was neither a large nor a small pistol; was about eight inches long and was, the witness thought, about forty-five in caliber. It had, the witness thought, a bronze colored handle. He judged of this fact only by the glistening of the metal. He did not know whether it was a revolver or a single shooting pistol. The last shooting seen by the witness occurred between the bank and Riley's drug store, nearer the drug store than the bank. It occurred a little to the left of the front of the witness, about fifty or sixty feet distant from him. The first shooting occurred in front of the Central Hotel. Whatever it was that the defendant had in his hands when the fight ended was given by him to Mr. Jones.

J. W. Linnen testified, for the State, that he saw the Irvine boys near Riley's drug store an hour or two before the shooting. Tom wanted to go into Kerr's office and see him about the vase and note. Defendant said to Bob Tieves that Tom must not be allowed to go into Kerr's office; that he could see Kerr on the street; that if he went into Kerr's office Kerr would kill him, and he, defendant, would then have to kill Kerr. Kerr lived on Wise street, and in going to his house from his office he usually passed down Tarrant to Mason street, going by Riley's drug store, and thence to and down Wise street to his home. Witness did not see the first of the difficulty. When it began he and 'Squire Stallings were down on Mason street, five or six hundred feet distant. While standing at that point the witness heard something like a slap and then a pistol

shot. He then looked around and saw Kerr and Tom Irvine shooting at each other. Witness saw smoke from what he took to be a pistol in the hands of the defendant, and thought that he too was shooting. He did not see the defendant strike Kerr, but did see him run up to and grasp Kerr, after which Tom Irvine ran up and shot Kerr. Witness may have been mistaken as to the defendant having a pistol. He, witness, was excited, and there was considerable smoke in the street, produced by the firing of the pistols.

John Stotts testified, for the State, that he was in front of Riley's drug store when the difficulty occurred. He first heard Tom Irvine and Kerr quarreling in the street in front of the drug store. He heard Tom tell Kerr that he would fight him in any manner he would suggest,— that he wanted to fight or shoot it out. Kerr replied by telling Tom to go away and let him alone,— that he did not want to have any trouble with him, as he did not settle business in that manner. Tom called the defendant, who came and handed Kerr a paper, with some words which witness did not hear. Kerr made some reply, and defendant slapped him, whereupon Kerr stepped or staggered back and drew his pistol. Tom Irvine then drew his pistol, and he and Kerr fired. Kerr first covered the defendant with his pistol, but turned and fired it at Tom. Defendant then closed upon Kerr, and Kerr knocked him down with his pistol. Getting up defendant caught up a plank, which he broke over Kerr's head. The defendant then caught Kerr, a pistol fired, and Tom Irvine ran around defendant and shot Kerr, and defendant eased him to the ground.

Cross-examined, the witness testified that defendant had on a vest but no coat. He had nothing in his hand but the note until he picked up the plank. He, defendant, approached Kerr after the shooting commenced with his hands up in a "catching" attitude. He was knocked down by Kerr as soon as he got in reach, and got up with the plank. Witness saw a piece of the plank fly through the air when the blow was struck, but saw no pistol thrown or projected through the air. When Kerr and defendant clinched they had their hands up, defendant trying to get Kerr's pistol. When the shooting first began witness ran towards the combatants and called to bystanders: "Let's stop this thing!" But, as no one offered to assist witness, he did not go further towards them.

Doctor W. G. Hayes, testifying for the State, described the wound on deceased's person. He was struck by two balls. The first glanced across his abdomen and lodged in the thigh, inflicting only a slight wound. The flash from that shot set fire to his clothes.

The mortal wound was in the right breast. The ball, entering about four inches below the nipple and three inches to the right of the center of the chest, passed through the body and lodged in the spinal column. That shot also powder-burned the clothing and flesh. Kerr was shot about 6 o'clock and died about 10. At about 9 o'clock he asked if either of the Irvines was shot. Being answered in the negative, he said that that fact was the only thing he regretted. When asked why he did such poor shooting, he answered that defendant held him while Tom Irvine shot him. The State closed, and the case was opened for the testimony of the defense.

B. E. Green testified that he had resided in Montague county, Texas, since 1876, and had held for one term each, the offices of county judge, county attorney and county treasurer of Montague county. He had known the defendant since his location in Bowie in 1883, and knew his reputation for peace and quietude, and knew that, during that period, he had sustained the reputation of a peaceable, quiet and law-abiding citizen.

Clark Arnold corroborated Judge Green's testimony as to the reputation of the defendant as a peaceable and law-abiding citizen. He testified, in addition, that he saw the defendant, just before the shooting, when he went from the furniture store to where Tom Irvine and Kerr were, in response to a call for him. Witness was closing the door of his shop on Mason street, when defendant passed by on his way to the place where the fight occurred a few minutes later. He was in his shirt sleeves, but wore a vest. Witness saw no pistol on the defendant's person or in his hands. He had no paper in his hands that the witness saw. He walked leisurely and not rapidly, with his hands down by his side. Witness noticed particularly to see if he had a pistol. He was led to do so by the fact that he saw Kerr and Tom Irvine standing in the street a short distance off, and expected trouble from the fact that they had had a difficulty some ten days before. In anticipation of a struggle which he did not wish to see, the witness went into Raines's store before the collision.

Wade Atkins supported the testimony of the two previous witnesses for the defense as to the defendant's unexceptionable reputation for peace and quietude. He did not see the difficulty, which occurred while he was down beyond the railroad grade, engaged in a game of ball. He heard the shooting. There was a slight intermission after the first shot was fired, and then the shooting became rapid. Climbing up the railroad grade, and looking from that point, he saw a body lying on Mason street near the public well.

Cross-examined, the witness said that on his way back to business, he saw the defendant in the back room of his store washing blood from his face and head. The wound from which the blood was flowing looked like a bullet hole.

J. I. G. Cowan testified as did the previous witnesses for the defense as to the defendant's reputation as a quiet and law-abiding citizen. He stated further that he saw the fatal difficulty. Witness, while near Kapp's store, going down the street, met the defendant going up. Defendant went on to the point where Kerr and Tom Irvine were standing. He stood quietly for about thirty seconds and then struck at Kerr with his fist. Kerr then struck at the defendant with a pistol. Kerr then fired at Tom Irvine, and the next two shots were fired very nearly together. Kerr and Tom did all the shooting. Defendant did not fire a single shot during the fight. If he had fired a single shot, witness would certainly have seen it. Kerr shot at the defendant, and the defendant dropped down; then straightened up and ran up to Kerr and caught him by the shoulder. The witness was absolutely certain that the defendant did not shoot a single time, unless he fired the last shot, which shot the witness did not see.

Cross-examined, the witness stated that the position of defendant with respect to Kerr during the fight was on Kerr's left, and Tom Irvine was to Kerr's right. Defendant was dodging bullets during the time that Kerr and Tom were shooting at each other. Kerr fell from fifty to seventy-five feet from the point where the fight commenced, having backed that distance. Defendant's head was cut. Witness did not know whether or not defendant was excited during the fight. Witness saw the defendant, Tom Irvine, Doctor Riley, E. L. Jarrett and others near Kerr's office some two hours before the shooting.

William Rose testified that he had charge of the threshing engine spoken of by a State's witness, and had it on Tarrant street when the fatal rencontre occurred. Witness first saw Kerr and Tom Irvine standing on Tarrant street. They soon left that point together, and walked to a point on Mason street, where they stopped. Tom Irvine then called to the defendant, and the defendant came to where he and Kerr were standing. He handed Kerr a paper, and soon after struck him with his fist. Kerr then struck the defendant and knocked him down, and then turned and fired his pistol at Tom. If the defendant had a pistol, witness did not see it. Kerr drew his pistol before Tom Irvine drew his, and as soon as Tom drew his pistol the witness went into a house.

Cross-examined, the witness said that Kerr fired at Tom Irvine before witness went into the house. When defendant came to the place where Tom and Kerr were, he came in a walk. He was called but once by Tom, so far as the witness heard. Tom Irvine had a coat on during the fight.

Mrs. L. P. Hoover testified that she heard the shots fired in the difficulty which resulted in the death of Captain Kerr. Witness went to Kerr's house to see him about 7 or half-past 7 o'clock, which was after the fight. She heard Kerr, at about 8 o'clock, say that he felt very badly; that the defendant struck at and missed him, and that he then fired the first shot, which he fired at Tom Irvine. He then called to his wife and said: "Vesta, telegraph your mother that I am mortally wounded, and to come." When he made these statements Captain Kerr was in his right mind, and was perfectly rational.

Doctor W. G. Hayes testified that he saw Kerr after he was shot, first in Crawford's store and then at his house. After he was taken home, Kerr said that Tom Irvine shot him in the side, and the reason he made no better defense of himself was that defendant held him. Two hours after this statement Kerr asked if either of the Irvine boys were hurt, and upon being informed that they were not, he said that he regretted only that he failed to hurt them. Doctor Riley and witness were called together to see Kerr. Witness heard Doctor Riley tell Kerr that his wounds were not fatal; that he should rally to pull through, as he had pulled through a worse scrape when his arm was shot. Witness had then told Mrs. Kerr, privately, that her husband's wounds were fatal, and that death would ensue speedily.

W. A. Phillips testified that he was standing at the corner of Mason and Wise streets in Bowie when the fatal difficulty between Kerr and the Irvines began, and thought that he saw the whole of the fight. He turned quickly on hearing a slap, and saw Kerr and Tom Irvine spring apart. Kerr then fired, first at Tom and then at the defendant. Defendant was doing nothing at all when shot at by Kerr. Tom Irvine then shot at Kerr, and the defendant seized a plank lying near by and struck Kerr with it, and then seized Kerr by the shoulder. Kerr backed to the well, when Tom Irvine stepped up and fired the last shot. Defendant had no pistol, and did not fire a shot.

Cross-examined, the witness testified that at the time of the shooting Tom Irvine was about fifteen feet from the sidewalk in front of Riley's drug store. Kerr shot twice at Tom Irvine and then turned and shot twice at the defendant. Kerr, while the shooting was in

progress, backed as far as the well. When the defendant struck Kerr with the plank the witness saw something fall, which at the time he thought was Kerr's pistol, but which must have been a piece of the plank. But one shot was fired after the defendant followed up and caught Kerr, and that shot was, the witness thought, fired by Tom Irvine, who passed his hand around the defendant to do it. Defendant and Kerr were twenty feet apart when Kerr fired at defendant.

D. H. Taylor testified that he saw a part of the fatal difficulty from a distance from the parties of twenty-five or thirty feet. He saw Kerr and the defendant run together, when defendant struck Kerr with a board. The two then clinched, the defendant catching hold of Kerr's pistol, which Kerr held in his hand. The fatal shot was then fired, but the witness was unable to decide whether it was fired from Tom Irvine's pistol, or whether it was discharged from Kerr's pistol. Witness saw but two shots fired, though he heard as many as five others. Kerr and defendant had about got together when witness saw them first, and it was witness's opinion that defendant pulled Kerr's pistol hand down, and that the fatal shot was discharged from Kerr's own pistol.

Doctor H. Riley supported the testimony of previous witnesses as to the good character of the defendant as a peaceable and law-abiding citizen. The witness saw the defendant and Tom Irvine together about an hour before the fatal difficulty occurred. Tom wanted to go into Kerr's office and see him about a matter which had given him offense. Defendant used his utmost endeavor to prevent Tom from going into Kerr's office, telling him that he must not invade Kerr's office, and that he, the defendant, would see Captain Kerr at some other time and reach an amicable settlement of the trouble. Tom Irvine was then mad and drinking. Defendant was perfectly sober, and, apparently, in a perfectly even and unruffled temper; not mad, so far as the witness could discover. Tom, the defendant, Jarrett and the witness were standing within ten steps of Kerr's office, when Tom was avowing his purpose to go into that office. Defendant did everything in his power to keep Tom from going in, and finally, with the witness's aid, succeeded. Tom then declared that he intended to whip Kerr, and that he would make the defendant whip Kerr, and that if the defendant did not do it, he, Tom, would whip the defendant. Defendant again told Tom that he would see Captain Kerr and settle the matter amicably. Tom declared that the note that Kerr had written was an insult which he would not take, and which none of his brothers should take. Tom

and Kerr had a difficulty in witness's drug store some eight or ten days prior to the fatal one. Tom struck at Kerr and, being drunk at the time, fell. Kerr started at Tom with a four-bladed pocket-knife, but was stopped. Tom then took a vase from witness's counter, which he threw at Kerr. The vase struck Kerr, glanced and struck the show-case, sustaining a small break in the collision. Defendant was not present when that difficulty occurred. Some time afterwards some one secured the broken vase and suspended it from witness's store porch with a note attached, reading thus: "This vase was presented to Captain J. W. Kerr, by Tom Irvine. Please let it hang." Some time afterwards Captain Kerr read the note, and wrote under it the words: "Whoever wrote this note is a contemptible puppy. J. W. Kerr." He, Kerr, then hung the vase and note back.

W. T. Pen testified to defendant's good reputation for peace and quietude, and, further, that he saw the concluding part of the fight. He saw defendant and Kerr scuffling. Kerr was trying to shoot the defendant when Tom Irvine stepped up and shot Kerr.

Robert Tieves testified that just before the shooting he saw Kerr and Tom Irvine together on Tarrant street. From Tarrant street they passed to Mason street in front of Riley's drug store and stopped, and Tom called the defendant twice. Defendant came up and stopped near them. Kerr then drew his pistol, with which he first struck the defendant and then fired at Tom. Tom Irvine then drew his pistol and two or three shots were fired simultaneously. Defendant had no pistol and did not fire a shot. He seemed to be trying to get to Kerr. Finally, after Kerr shot at the defendant, the defendant caught Kerr, and Tom passed around defendant and fired the fatal shot.

Cross-examined, the witness stated that Kerr fired the first shot, and fired it before Tom Irvine got his pistol out. Apparently it was defendant's purpose to prevent Kerr from shooting him.

T. G. Worley testified that he saw all of the difficulty after the first shot was fired. The first that the witness saw of the defendant, and that was just after the first shot was fired, he was getting up from the ground, and Kerr and Tom Irvine were shooting at each other. Defendant then got a board with which he struck Kerr, and then he caught Kerr, for the purpose, as it appeared to witness, of preventing Kerr from shooting again. While defendant had hold of Kerr, Tom ran up and fired the fatal shot. Tom passed all the way around the defendant to shoot Kerr. Defendant had no pistol.

Luther Raines testified that he did not see the first shot, but saw all of the fight subsequent to it. He stepped to his door, looked up Mason street, and saw Kerr and Tom Irvine shooting at each other. Defendant went towards Kerr with a plank and struck him, and then clinched with him, when Tom stepped up, put his pistol around the defendant and fired the fatal shot.

C. F. Bowers testified that, just before the shooting began, he saw the defendant going from his place of business on Mason street towards the point in that street where Kerr and Tom Irvine were then standing. He stopped near Kerr, handed him a piece of paper, and presently struck or struck at Kerr with his fist. Kerr then pulled his pistol and knocked the defendant down with it, and fired it at defendant while he was on the ground. Kerr and Tom Irvine then shot at each other. Defendant, who meantime had got up from the ground, picked up a board and struck Kerr, and then closed on and clinched him, and Tom Irvine then fired the fatal shot. Defendant eased Kerr to the ground, at the same time motioning with his hand for Tom to keep back. Defendant then picked up Kerr's pistol, looked at it, and laid it down again. Defendant had no pistol and did not fire a shot during the affray.

Cross-examined, the witness testified that Kerr fired the first two shots and gave back. Tom then pulled his pistol and he and Kerr fired almost simultaneously. Witness did not know that the defendant struck Kerr in the face at the beginning of the fight, but he did know that defendant struck at him, and that Kerr then knocked him down with his pistol. Defendant had a wound on his forehead after the difficulty. Tom and Kerr did all the shooting, and had the only pistols engaged in the battle.

F. S. Williams testified that he saw the fatal affray between Kerr and the two Irvines from the window of his printing office, which was located over a saddle shop on Mason street. Witness was closing up to start home when he saw Kerr and Tom Irvine come down the street and stop in front of the saloon. While they were standing there Kerr said to Tom: "I don't want any difficulty, but if I have to fight, I will fight you." Kerr then handed a letter to Mr. Jones. Tom called the defendant, who came up the street from the direction of the furniture store. When he reached the parties, he handed Kerr a piece of paper. Kerr took the paper and immediately threw it back at the defendant. The defendant then struck at Kerr with his fist, and Kerr drew his pistol and fired it at Tom. The next shots were fired immediately and almost simultaneously by Kerr and Tom at each other. Defendant then rushed

upon Kerr and Kerr knocked him down with his pistol, and fired at him while he was down. Defendant caught up a board as he got up, and struck Kerr over the head with it. Kerr and defendant then clinched, and struggled backwards. Defendant was then between Kerr and Tom, and seemed to be endeavoring to keep between them, but Tom passed around the defendant and fired the fatal shot. But the one shot was fired after Kerr and defendant clinched. Witness would certainly have seen defendant's pistol if he had had one. He had no pistol, nor did he fire a single shot during the entire affray. On cross-examination the witness said that he heard Kerr say to Tom: "If you want to fight, get at it."

C. C. Johnson testified that he, F. S. Williams and M. B. Hoskins were standing on the veranda, upstairs over the saddle shop, just before the shooting began. While there, witness saw Kerr and Tom Irvine standing together in Mason street, talking in a low tone of voice. While they were talking the defendant joined them, and handed Kerr a piece of paper. Kerr made some remark and defendant struck him with his fist. Kerr then "wheeled" off, drew his pistol and fired it in the direction of where Tom Irvine was standing. The next two shots were fired by Kerr and Tom at almost the same instant. Witness then walked back into his office. Defendant had nothing in his hand during the time the witness saw him except the piece of paper. Witness would certainly have seen anything else in his hands. Witness stepped back to the veranda presently, and saw the defendant getting up from the ground. As he got up he caught up a piece of plank, rushed upon Kerr and broke the plank into pieces over his head. Defendant then clinched with Kerr, and some shots were fired from near the well. At that time witness could see no one near the well but Kerr. Tom and defendant had hold of Kerr when the last shot was fired, and witness thought that Tom fired the last shot.

Cross-examined, the witness stated that he and Kerr were both attorneys, but were not partners. The witness was not professionally interested in this case.

A. P. Stephens testified that while he was standing on the platform in front of the saloon he saw the defendant walk up to Kerr and hand him a note, and heard him ask Kerr if he wrote that note. Kerr said that he did, and the defendant struck him with his fist. Tom Irvine, at that time, was standing near with his hand under the front of his vest, with which hand he began immediately to draw his pistol from the waist of his pants. Tom's pistol seemed to hang, or to be caught in some way. Kerr sprang back, drew his

pistol, being the first to get a pistol out, pointed it at defendant, but instantly deflected it and fired at Tom. Defendant then rushed at Kerr, who struck him with his pistol and knocked him down to his hands and knees. Tom and Kerr then fired two or three shots at each other, almost together. Kerr then started backwards, and defendant rushed upon him and struck him with a board, and then clinched with him, and began a struggle for Kerr's pistol. About that time Tom ran up and shot Kerr. Defendant had no pistol, nor did he fire a shot during the fight. When the fight was over, the witness heard the defendant say to his brother: " Tom, you ought not to have done that when I had hold of him."

Cross-examined, the witness said that at one time he thought that defendant had a pistol, but he soon saw that the instrument he had was not a pistol, but a piece of plank. But two pistols were used in the affray, and they were used by Kerr and Tom Irvine. Witness did not think that Tom and the defendant, though brothers, stayed much together. There was a marked difference between the disposition and habits of the two Irvine boys. Tom was wild, but the defendant was a peaceable, law-abiding boy.

E. B. Partridge testified that while he was standing on the platform in front of the saloon at the corner of Tarrant and Mason streets, he saw Kerr and defendant and Tom Irvine standing together on Mason street. As the defendant stepped up, Tom stepped off. Defendant handed Kerr a note and asked him if he wrote it. Kerr replied: " Yes, and I meant every word of it." The defendant then slapped at Kerr, and Kerr immediately struck defendant with a pistol and knocked him down. Kerr then shot at Tom, and Tom drew his pistol, and he and Kerr fired several shots at each other. Some eight or nine shots altogether were fired by Tom and Kerr. Defendant, after he was knocked down, picked up a board and struck Kerr over the head. He then rushed upon Kerr, caught him, and called to Tom to keep back. Kerr and Tom were the only parties who had or fired a pistol during the affray. Defendant had nothing in his hands from first to last except the paper when he came up, and the plank, or rather the barrel stave, with which he afterwards struck Kerr.

Cross-examined, the witness testified that he and Kerr were friends. When defendant caught Kerr, just before the fatal shot, he motioned his hand to Tom to go back, and when Tom came up he said to him: " Go back; I have him." When he first caught Kerr and motioned Tom back, the witness heard the defendant say distinctly: " Tom, go back; don't shoot any more; " and after the fatal

shot was fired, he asked Tom why he did it. Witness saw three shots fired but heard several others.

H. E. Puryear testified that he saw three of the shots fired, and heard the others. He saw the defendant run up and strike Kerr, and then clasp him, and heard him, when Tom ran up, tell Tom to stand back. Tom paid no attention to defendant, but passed around him and fired the fatal shot. Defendant had no pistol during the affray.

The material part of the testimony of James Alsabrook was to the effect that the defendant had no pistol during the affray, and that defendant, after Tom fired the fatal shot, said to Tom: "You ought not to have done that." Tom fired the second shot, and he and Kerr fired about four shots each.

J. D. Frazier testified that he was standing in front of Ward's saloon, and within thirty feet of the parties when the difficulty occurred. He saw the defendant strike at Kerr. Kerr then drew his pistol and fired. He fired his second shot a little before Tom fired his first. Defendant then rushed upon Kerr and struck him with a board. Kerr then knocked defendant down with his pistol. About this time, just as witness was leaving his position in front of the saloon, he saw defendant struggling with Kerr in his embrace, Kerr having his pistol in his hand. Tom ran up and shot Kerr, when defendant said to him: "Tom, you ought not to have done that." Witness saw nothing in defendant's hands except the board with which he struck Kerr, until Kerr fell, when he picked up Kerr's pistol, looked at it, and laid it down. Jack Sanders stood nearer the parties than witness did.

Cross-examined, witness said that Kerr fired the two first shots at Tom, though he first pointed his pistol at defendant. Tom's first was the third shot fired. When Tom ran up to Kerr, while defendant was holding him, Kerr cried: "Go away, Tom."

Jack Sanders testified that he had charge of the "separater" on Tarrant street, near Ward's saloon, in July, 1885. He was at the "separater" when the fatal rencontre took place. He saw Kerr shoot at Tom. He then saw defendant rising into an upright position when he was shot at by Kerr. Tom then fired his first shot, firing it at Kerr. Kerr then backed to the well. Defendant then struck Kerr and caught and struggled with him, Kerr endeavoring to shoot him. Tom ran up and shot Kerr while Kerr and the defendant were clinched. Defendant had no pistol in his hands during the affray until he picked up Kerr's pistol after the affray, and laid it down again. After the fatal shot was fired and Kerr had

fallen, defendant said to his brother: "Tom, why did you shoot him? I had him."

Cross-examined, the witness said that the defendant wrenched Kerr's pistol out of his hand after he fell. Witness heard the board break when defendant struck Kerr with it. He heard Kerr, when Tom ran up to fire the last shot, call to him: "Tom, go away."

R. L. Thompson testified that he was standing on Mason street, in front of the saddle shop, and saw the larger part of the fatal affray. The first seen by the witness was Kerr when he drew a pistol and struck at the defendant with it. He then fired at Tom and turned his arm and fired at the defendant. Tom then fired at Kerr. Witness then stepped into the saddle shop and came out again just before the last shot was fired. When witness came out he saw that defendant had hold of Kerr struggling with him for his, Kerr's, pistol — holding the pistol from him. As Tom came up, defendant cried: "Tom, don't shoot him." · Defendant had no pistol, nor did he fire a single shot.

J. O. Ward, the proprietor of Ward's saloon, testified that he was standing within eight feet of his saloon when the fight took place. The first which witness saw of the affray, defendant was reaching down to pick up a board. Kerr was then backing with a pistol in his hand. Defendant advanced upon Kerr, struck him with the board, and then clinched him. Tom then passed around defendant and fired his pistol against Kerr's side. Before he did so, defendant called to him to stand back or to keep back, and was evidently trying to keep himself between Kerr and Tom. Defendant neither had nor fired a pistol during the fight. Tom and defendant were in witness's saloon about an hour before the difficulty. Tom was drinking, and called for and took a drink while in the saloon. Defendant was perfectly sober, and did not take a drink. Witness had not known defendant take a dozen drinks in the time that he had known him. While in the saloon, Tom said to defendant: "Sid, you must whip Kerr or I will whip you." Defendant replied pleasantly: "You cannot do that." Tom said: "Well, you must whip Kerr." Defendant replied: "I don't know that I can do it." Defendant tried his best to keep Tom from going about Kerr, and said to him: "You don't want any truck with Kerr."

Cross-examined, the witness testified that while in his saloon Tom took out his pistol and said that it contained a load branded "Kerr." This was about an hour before the fight. Defendant was present and heard the remark. Witness saw the defendant, after Kerr's fall, pick up and examine Kerr's pistol and lay it down again.

W. M. Spear testified that he saw the fatal affray. Kerr and Tom stopped in front of Crawford's store and Tom called: "Sid, Sid, come here!" Defendant came up and struck Kerr with his fist. Kerr staggered back, drew his pistol and leveled it on Tom, and fired just as Tom dodged. The next two shots were fired at almost the same instant of time. The firing then became rapid. Deceased backed to the well, where defendant caught him, and Tom came up and shot him. Some one said: "Don't, Tom!" just as Tom fired. Witness thought, though he was not positive, that Kerr made the remark. Kerr and Tom did all of the shooting. Defendant had no pistol.

Cross-examined, the witness testified that he thought, but was not positive, that the words "keep away" and "don't Tom" were spoken in Kerr's voice.

George H. Davies testified that he saw the defendant step up to Kerr and Tom as they stood on Mason street. He next saw Kerr step back and shake his head. Defendant then struck at Kerr with his fist. Kerr then drew his pistol and knocked the defendant down with it, and then fired his pistol at Tom. Defendant then struck Kerr with a board. Defendant had no pistol at any time during the difficulty.

Cross-examined, the witness testified that he left the scene of the fight with Tom, and walked with him as far as Jarrett's office. He tried to get Tom to put up his pistol. Tom asked witness if the defendant was hurt, and witness told him that he was not. Witness had no recollection of saying in Penn's store that it was a "d—d slick job." The defense closed, and the State resumed in rebuttal.

John Stotts testified that, about fifteen minutes after the affray, he saw E. B. Partridge in front of Crawford's store, and heard him say: "G—d d—n him, he got his just dues."

Mrs. Kerr testified that Mrs. Hoover was at her house after her husband was brought home wounded. If she was sent for, the witness did not know it. While she was there Kerr said to witness: "Vesta, telegraph your mother that I am mortally wounded, and to come." He said nothing else while the witness was in the room, and she was out of the room at intervals.

The application for a continuance, which is the subject-matter of the second head-note of this report, set out that the defense expected to prove by one Chub Thomas, who was absent, and not accessible on the trial, that the said Thomas saw and talked with Kerr about two hours before his death, after Kerr had been advised that his wounds

were mortal and that he would not survive them, and while the said Kerr was yet conscious and clear of mind; that the said Kerr at that time, as a death-bed declaration, made a statement of the circumstances attending the affray in which he was shot; that Kerr, in that death-bed declaration, stated that he was shot by Tom Irvine, and that this defendant did not shoot at him; that he, Kerr, fired the first shot at Tom Irvine, and that the defendant did not shoot or attempt to shoot at him; that Tom Irvine was the party who inflicted upon him his mortal wounds; that the said Kerr stated in the same death-bed declaration that this defendant did not strike him during the difficulty, but struck at him and missed him, and that the defendant did not have a pistol, and that all he, the said Kerr, regretted was that he had not killed both Tom Irvine and the defendant, and that he shot at both Tom Irvine and the defendant, and missed them.

By each of six other witnesses named in the application, the defendant alleged that he expected to prove that they were present and saw the fight; that the defendant at no time during the affray shot or attempted to shoot at Kerr, and that he had no pistol in his hands at any time during the affray; that the only pistol he had in his hands at any time on the scene of the shooting was Kerr's pistol, which he took up from the ground after Kerr fell, and immediately restored to its former place upon the ground; that Tom Irvine shot and killed Kerr; that Kerr shot at Tom Irvine before Tom Irvine shot at him; that the defendant repeatedly, before the fatal shot was fired by Tom Irvine, called to him to keep away and not to shoot.

The motion for new trial raised the questions discussed in the opinion.

*Furman & Stedman* and *Stevens, Matlock & Herbert,* for the appellant. The first ground upon which we rely to secure a reversal of the judgment of conviction is the action of the court in overruling appellant's motion for a continuance and in refusing to grant appellant a new trial on this ground.

Upon an inspection it will be found that the appellant had exercised extraordinary diligence and that the application comes fully up to all of the requirements of the law.

That the absent evidence was material to the point in issue cannot be doubted. In substance, appellant desired to prove by said witnesses that he (appellant) was not armed and did not participate in the fatal encounter between his brother, Tom Irvine, and deceased,

J. W. Kerr, but that appellant repeatedly called to said parties not to shoot.

Under our just and humane law no man can be convicted of an offense in which he did not participate and of which he did not approve. There must be a union of both act and intent to make one responsible as a conspirator. Any amount of action without the intent will not be sufficient to charge one with responsibility for the actions of another, and any amount of intent without at least some action is also insufficient. They must both concur. ( *Welsh* v. *The State,* 3 Texas Ct. App., 413; *Roundtree* v. *The State,* 10 Texas Ct. App., 110; *Stevenson* v. *The State,* 17 Texas Ct. App., 618.)

Therefore, under these authorities, the evidence set out in the application for a continuance, if true, would be a complete bar to the case against appellant. The trial judge has not favored this court with any explanation of the ground upon which he overruled the application. While it is true that under our statute the trial judge could pass upon both the sufficiency of the application and the truth of the proposed evidence, and might, in his discretion, refuse or grant even the first application for a continuance, yet this discretion must not be arbitrarily used, but the court must exercise a sound and humane discretion, having due regard for the rights of defendant as well as for the enforcement of the law. ( *Harris* v. *The State,* 18 Texas Ct. App., 287.)

The question which now presents itself before this court, on appeal, is, viz.: Does it now appear that the evidence of the witnesses named in the application was material and probably true? If this appears, then the conviction should be reversed. (Code Crim. Proc., art. 560.)

How must the truth of this evidence be made to appear? There is no burden resting affirmatively upon the appellant to show that this evidence is probably true. If the evidence is not inconsistent with the facts proven upon the trial, then upon every principle of humanity and law the court must hold that the evidence stated in the application is true. It has been duly sworn to, and there is nothing to impeach it. (12 Texas Ct. App., p. 330; also p. 554 and p. 583.)

When the court reads the evidence in the record it will be seen that while there are two witnesses from whose evidence it might be inferred that appellant was armed and participated in the shooting of deceased, yet that there are upwards of twenty other witnesses with whose evidence the application for a continuance harmonizes, and that there are some eight or nine witnesses who testified sub-

stantially to the same facts as those stated in the application.   As the trial judge did not place upon record the basis upon which he exercised the discretion confided to him by the law in overruling the application for a continuance and in refusing to grant a new trial, it may be that the court acted upon the assumption that the appellant was not injured, because he (appellant) had the benefit of the same character of evidence upon the trial of the cause, and the continuance was sought simply to procure cumulative evidence. This might be correct upon a second or any subsequent application for a continuance, but it will not do for a first application.   The law does not require a defendant, in his first application for a continuance, to state that he cannot procure the same evidence or prove the same facts by any other witnesses.   (Code Crim. Proc., art. 560.)

Appellant had the right to prove his defense by as many witnesses as possible, and it is no answer to a first application for a continuance to say that the absent evidence is cumulative.   (*Pinckord* v. *The State*, 13 Texas Ct. App., 468; 17 Texas Ct. App., 650; *Wilson* v. *The State*, ·18 Texas Ct. App., 577; *Adams* v. *The State*, 19 Texas Ct. App. 1.

Even if the application for a continuance might be defective, in omitting to state some of the statutory requirements, and even if the desired evidence was cumulative, yet if the evidence therein set out should appear to be material and probably true, this court will consider it upon appeal and reverse the case.   (*Stanley* v. *The State*, 16 Texas Ct. App., 393.)

Another ground upon which appellant now seeks a reversal of the conviction against him is that the charge of the court is cumulative and argumentative, and that it repeats, emphasizes and too prominently brings to the attention of the jury the conditions upon which appellant could be convicted.

This vice in the charge was called to the attention of the court before the charge was read to the jury, and upon the refusal of the court to alter the charge a bill of exceptions was reserved to the charge on this account.

It will be found that the charge of the court is cumulative, and does repeat time and again in such a manner as to impress upon the minds of the jurymen the idea that in the opinion of the trial judge the appellant was guilty.   The views of law favorable to the State are pointedly emphasized and prominently placed before the attention of the jury.   If the judge can thus intimate to the jury his opinion of the guilt of the appellant, the statute forbidding him

to sum up the evidence or charge upon the weight of the evidence is rendered nugatory. (Code Crim. Proc., art. 677.)

In the case of *Powell* v. *Messer*, 18 Texas, 406, our supreme court says the judge should embody in his charge rules of law applicable to the case in such form and connection as to give to each no more than its due relative prominence, and that to repeat portions of the charge in the form of independent and distinct propositions may not unfrequently have the effect to give to the principles thus enunciated an undue prominence and importance in the minds of the jury, and thus to mislead them in the application of the law to the evidence, and that it is the manifest duty of the court to guard against such a consequence.

In the case of *Taylor* v. *Townsend*, 61 Texas, 147, our supreme court says: "It is undoubtedly improper for a court to place, by frequent repetitions, too prominently before a jury any principle of law involved in the case." This court has always ruled that when the trial judge has in his charge given a fair presentation of all of the law in the case, it is his duty to refuse special instructions asked by counsel for the defense covering points given properly in the main charge. It makes no difference how proper the special instruction may be, if the point is once given. The reason of this is that by giving a special instruction on a point already charged upon, the point is given undue prominence before the jury, and is, therefore, detrimental to the interest of the State.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. This is an appeal from a judgment of conviction for murder of the second degree. The two different theories of the prosecution and the defendant, as insisted upon on the trial below, are most concisely and correctly presented in the able brief of counsel for appellant, as follows:

"The prosecution contended that the appellant, acting in concert with his brother, Tom Irvine, and in pursuance of an agreement between them, brought on the difficulty which resulted in the death of J. W. Kerr, for the purpose of giving Tom Irvine an excuse or opportunity to murder said Kerr, and that therefore the appellant was as guilty as if he himself had fired the fatal shot. On the other hand, the defendant contended that he did not participate with his brother, Tom Irvine, in any design to kill or inflict serious bodily injury upon said Kerr; that while it was true that appellant did strike the first blow in the difficulty between the deceased and

himself, which immediately preceded the killing, yet his only purpose in so doing was simply to inflict upon said Kerr personal chastisement for some real or supposed insult, and when Kerr and Tom Irvine became engaged in a mortal combat, the appellant then, in good faith and at the peril of his life, attempted to stop the shooting, and to prevent either of said parties from killing or inflicting serious bodily injury upon the other."

Two main points relied upon for a reversal of the judgment are, 1, overruling defendant's first application for continuance; 2, defects in the charge of the court.

Ten absent witnesses are named in the application for continuance, the attendance of seven. of whom, it is stated, could not be procured by a postponement of the case to some future day of the term.  There can be no question as to the diligence used by defendant to secure the attendance of said witnesses; there can be no question as to the materiality of the testimony sought to the defense; and, viewed in the light of the testimony adduced, there can be no question that most, if not all, the proposed testimony is probably true, because most of it is corroborated by the testimony of some one or more of the witnesses who did testify, and all such as is not corroborated is matter of most serious moment to the defense. In substance, defendant proposed to show by the absent witnesses that, at the time of the fatal rencounter, he, the said defendant, was not, as testified by several of the State's witnesses, armed with a pistol, and that after the difficulty commenced he used his endeavors to prevent his brother and deceased from shooting each other. Some of the evidence proposed may be cumulative of the testimony subsequently elicited from the witnesses who testified; this, however, is no answer to a first application for a continuance. (*Pinckord* v. *The State*, 13 Texas Ct. App., 468; *Ninnon* v. *The State*, 17 Texas Ct. App., 650; *Hughes* v. *The State*, 18 Texas Ct. App., 130; *Wilson* v. *The State*, 18 Texas Ct. Ap., 577.)

An application for continuance, though a first one and in compliance with statutory requirements, is, it is true, not a matter of right; still the discretion exercised by the court in overruling it must not be an arbitrary but a "sound" one.  (*Harris* v. *The State*, 18 Texas Ct. App., 287.)  And especially should a "sound discretion" be shown in connection with the overruling of such application, when the court has a second time in effect overruled it in refusing a defendant a new trial after conviction. (Code Crim. Proc., art. 560; *Miller* v. *The State*, 18 Texas Ct. App., 232.)

In this case we are of opinion the application should have been

granted in the first instance, and that a second error was committed by the court with regard to it when the motion for a new trial was overruled.

We will not discuss *seriatim* the objections made to the charge of the court. It occurs to us that in more than one respect it is obnoxious to the criticisms made by appellant's counsel, and the objections urged to it. In *Traylor* v. *Townsend*, 61 Texas, 144, the court say: "It is undoubtedly improper for a court to place, by frequent repetitions, too prominently before a jury any principle of law involved in the case." (Citing *Powell* v. *Messer*, 18 Texas, 401.) And especially is such rule important in a criminal case, in order to guard against creating an impression upon the minds of the jury as to what may be the opinion of the court with regard to the facts to which the principle is applicable. (7 Texas Ct. App., 183, 332, 383.)

A charge is also objectionable which presents the phases of the defense in a negative form only. A defendant is entitled to a distinct and affirmative, and not merely an implied or negative, presentation of the issues which arise upon his evidence. (*Reynolds* v. *The State*, 7 Texas Ct. App., 412; *Greta* v. *The State*, 9 Texas Ct. App., 429; *Jackson* v. *The State*, 15 Texas Ct. App., 84; *White* v. *The State*, 18 Texas Ct. App., 57.)

For the errors pointed out, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered December 12, 1885.]